| | | |
|---|---|---|
| **IN RE:** | : | **CIVIL ACTION** |
| **DEVAL CORPORATION** | : | |
| | : | **NO. 18-5135** |

## MEMORANDUM

**KEARNEY, J.**                                                                                    **May 17, 2019**

A business debtor working through its Chapter 11 bankruptcy reorganization may act—or fail to act—in ways harmful to the interests of its creditors, and perhaps even itself. Its creditors or other interested parties may respond by acting to protect the debtor's estate and their interests in it. But legal action after already at risk for losing money as a creditor can be costly. To encourage improved distributions possibly resulting from creditors taking an assertive role in a debtor's reorganization, Congress permits creditors to recover administrative expenses incurred in substantially benefitting the debtor's Chapter 11 estate. Creditors, however, may not seek a windfall solely for protecting their own interests. Creditors may recover administrative expenses only for steps transcending their narrow interests.

Properly applying these principles, the Bankruptcy Court found the Chapter 11 debtor failed for months to make efforts to secure the necessary sale of its business. Facing the debtor's inertia, one secured creditor eventually filed various motions which, the Bankruptcy Court found, jolted the debtor from slumber to action, eventually resulting in the long-awaited and necessary sale of the debtor and successful reorganization. After evaluating witness credibility and adduced exhibits, the Bankruptcy Court found the secured creditor's conduct transcended its narrow interest and warranted a partial award of administrative expenses and legal fees—but only for the steps

providing the substantial benefits to the estate. The Bankruptcy Court declined to award costs for certain expenses it found protected only the creditor's interests.

We find no clear error in the Bankruptcy Court's detailed fact findings based on the Bankruptcy Judge's credibility evaluations of extensive testimony and first-hand supervision of the various actors' conduct in this multi-year case. We affirm the Bankruptcy Court's reasoned award of administrative expenses.

## I.    Background[1]

DeVal Corporation "is a high-tech manufacturer of aircraft and weapon support equipment for the United States military."[2]  As early as 2008 or 2009, Irwin Haber, principal of PDI/DeVal Acquisition, LLC ("PDI"), first became interested in purchasing DeVal.[3]  In November 2010, DeVal and PDI "entered into an Asset Purchase Agreement" under which PDI would "acquire substantially all the assets of Deval."[4]  But PDI could not "obtain the necessary financing" for the deal, so "[t]he parties never closed on that Agreement."[5]  In February 2011, "PDI and Deval entered into a Management Agreement . . . which provided for PDI to manage Deval's business pending a closing on the Asset Purchase Agreement."[6]

"PDI advanced $2,011,861.12 to DeVal for operating expenses" during the term of the Management Agreement.[7]  DeVal repaid $1,391,500 of the $2,011,861.12 advance, "[l]eaving a balance of approximately $620,000."[8]  PDI obtained a judgment against DeVal for $982,933.96, plus continuing interest at 18% per annum.[9]  PDI domesticated the judgment in Pennsylvania, aware this action may force DeVal to seek bankruptcy protection.[10]  PDI executed on the judgment "in the early fall of 2016,"[11] resulting in BB&T Bank, DeVal's senior secured creditor, "freezing Deval's borrowings, sweeping Deval's cash, and failing to honor Deval's payroll checks."[12]

PDI forwarded to DeVal in early September 2016 "a two page term sheet proposing that PDI acquire all of Deval's personal property through a sale conducted pursuant to Bankruptcy

Code section 363, for a purchase price of $750,000, subject to higher bids."[13] It is not disputed PDI understood closing of the proposed transaction would result in no payment being made to DeVal's general unsecured creditors.[14]

## *DeVal's initial steps in bankruptcy court.*

Rather than close on a transaction with PDI, DeVal filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code on November 11, 2016.[15] PDI then delivered to DeVal a revised term sheet "in January 2017 propos[ing] that PDI acquire Deval's personal property in consideration of a payment of $675,000 to BB&T Bank, $25,000 in cash to Deval, and forgiveness of the PDI debt, subject to higher bids."[16] This proposed deal would have allowed Deval to retain the equity in its real estate; DeVal's unsecured creditors could have potentially recovered on pending claims in litigation.[17] But DeVal "failed to take any action to finalize the deal with PDI for two months."[18]

On March 9, 2017, DeVal moved for a 60-day "exten[sion] [of] the exclusive periods during which it may file and solicit acceptances to a plan of reorganization."[19] DeVal then reported it "had been negotiating the terms and conditions of a sale of substantially all of its assets to an interested party," believing a sale to be "imminent."[20] The interested party, however, "grew anxious with the Chapter 11 sale process," requiring DeVal "expand[] its sale and marketing efforts identifying other prospective purchases (sic) of its business assets and/or real estate."[21] DeVal reported it "plans to reorganize around the anticipated sale transaction and/or the proceeds of such sale and, accordingly, requires additional time within which to facilitate its sale and reorganization efforts."[22]

3

### *PDI's efforts in the bankruptcy.*

PDI objected to DeVal's request for an extension of the exclusivity period and alternatively requested appointment of a Chapter 11 trustee.[23] PDI argued DeVal "is administratively insolvent and its business is on the verge of collapse."[24] DeVal's "cash flow is so tight that the Shareholders have recently deferred one or more paychecks and taken a slight compensation cut along with the rest of the Debtor's workforce of about 29 people."[25] PDI argued although DeVal "has two large, and presumably somewhat profitable, long term contracts with the Navy," the company "has no cash with which to purchase the inventory necessary to commence production," despite the contracts "account[ing] for 50% of [DeVal's] normalized sales volume."[26] DeVal "delivered minimal, if any, production units to date and the contracts remain stalled and are classified by the Navy in a 'delinquency status.'"[27] PDI argued the contracts faced "imminent danger of cancellation."[28]

On April 4, 2017, Judge Chan extended "[t]he period during which [DeVal] has the exclusive right to file a plan of reorganization," to April 24, 2017 and extended "the period during which [DeVal] has the exclusive right to solicit acceptances of such plan" to June 23, 2017.[29]

### *Judge Chan rejects the first plan of reorganization.*

DeVal filed its first Plan of Reorganization on April 30, 2017.[30] The plan described an asset sale to Parts Life, Inc., conditioned on Parts Life obtaining financing of at least $2,700,000 and novation of DeVal's government contracts to Parts Life. Judge Chan described DeVal's plan as "patently unconfirmable," because the sale to Parts Life "would close before the government decided whether to approve the novation of its contracts with [DeVal], requiring the parties to later unwind the closing if the novation" failed to receive approval, and the financing contingency of

4

$2,700,000, "even if satisfied, would have fallen far short of the additional $950,000 needed to close."[31]

After a hearing, Judge Chan "refused to further extend the exclusivity period"[32] and "granted PDI the right to proceed with a competing plan."[33] PDI filed its first Plan of Reorganization on May 1, 2017.[34] PDI's plan "contained no financing contingencies and provided for a dividend to unsecured creditors of a minimum of 20%."[35] On May 19, 2017, PDI again moved for appointment of a Chapter 11 trustee.[36] PDI argued "[a]t no time have the Shareholders made any attempt whatsoever to use the presence of two interested parties to improve the return to unsecured creditors."[37] PDI offered to "fund the [Chief Restructuring Officer's] fees" and stated "if the Parts Life plan which pays PDI's claim in full on the effective date were to be confirmed and consummated, PDI would not seek any reimbursement."[38]

On June 5, 2017, PDI filed its First Amended Plan of Reorganization and supplemented its motion for appointment of a Chapter 11 trustee, informing the Bankruptcy Court DeVal "has substantially exceeded, and continues to substantially exceed, the maximum permitted use of cash collateral," with the likely source of DeVal's liquidity being "post-petition financing, obtained by [DeVal] out of the ordinary course of business without Court approval."[39]

On June 9, 2017, PDI filed its Second Amended Plan of Reorganization.[40] DeVal moved on June 20, 2017 for "an order authorizing [DeVal] to appoint Herbert McDonald of The Fulcrum Group as Chief Restructuring Officer to [DeVal] pursuant to Section 363 of the Bankruptcy Code."[41] Judge Chan authorized DeVal to appoint Mr. McDonald.[42]

The final versions of PDI and DeVal's plans "provided for a 100% distribution to general unsecured creditors."[43] Judge Chan "confirmed [DeVal's] Third Amended Plan and denied PDI's Fifth Amended Plan" on August 7, 2017.[44]

5

## *PDI moves for an award of administrative expenses.*

On December 22, 2017, PDI moved for an award of $181,435.98 in administrative expenses under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.[45] PDI argued it was the only creditor to take an "active role" in the case,[46] and its "actions directly resulted in the marketing and sale of [DeVal's] business and the Plan-Effective-Date payment in full of all creditors other than subordinated insiders."[47] PDI specified three actions it took "to force [DeVal] to proceed with the sale of its business or with an alternative resolution of its Chapter 11 case: (a) PDI objected to the extension of exclusivity, (b) PDI drafted a plan of reorganization providing for the sale of [DeVal's] business and assets to P[DI] or a higher bidder, and (c) PDI sought the appointment of a Chapter 11 trustee due to [DeVal's] dereliction of its duty to pursue a reorganization."[48]

The Bankruptcy Court held an evidentiary hearing on PDI's request for administrative expenses on August 1, 2018.[49] Judge Chan heard testimony from Irwin Haber, PDI's principal, and Sam Thevanayagam, President and CEO of Parts Life, Inc.[50] Mr. Haber acknowledged his "ultimate goal during this process would be to get paid on my claim, on the judgment."[51] But he testified throughout the first four months of the case PDI remained on the sidelines as an observer. "We were just monitoring what was going on in that first four-month period," Mr. Haber testified, "[b]ut it was pretty clear during this process that they were doing nothing."[52] Realizing "[n]obody else was doing anything," Mr. Haber testified PDI "had to take action, otherwise this case would languish."[53] He described Deval's position as "perilous":

given their perilous cash position, given the company's fragile cash position, they could have fallen off the cliff at any time. That would have been bad for everybody. So at that particular point in time, we felt that a trustee would really move this case along and — and help to effect, you know, the recovery on the estate.[54]

6

Mr. Haber testified in March 2017 PDI "became aware that there is an opportunity that if we proceed or that if we did things that benefitted the estate, that we had an opportunity to recover."[55] Mr. Haber testified the "opportunity, although not a guarantee" for recovery of expenses "weighed heavily in [PDI's] decision" to proceed aggressively.[56] Mr. Haber testified PDI left the sidelines and took an active role in the case after witnessing Deval fail to do anything of substance during the 120-day exclusivity period. Had recovery of expenses not been a prospect, Mr. Haber testified it would have "it would [have] be[en] unlikely that we would have proceeded down this path to invest the kind of money and time that we did."[57]

### Judge Chan's August 1, 2018 fact findings.

At the end of the August 1, 2018 hearing, Judge Chan made fact findings relating to PDI's contribution to DeVal's reorganization. Judge Chan found DeVal "had done nothing . . . to find a buyer" by the time of the Bankruptcy Court's April 2017 hearing on the motion to extend the exclusivity period.[58] DeVal "was not moving the ball forward" and used the cash collateral hearings only "to buy time."[59] Judge Chan characterized Deval's inertia in stark terms: "[w]ith every passing day [DeVal] was further behind in implementing an exit strategy which would save the company, its employees, and any chance of paying back the creditors and the estate."[60]

Judge Chan found "PDI substantially contributed to this case by pushing this debtor to take affirmative action in this case to pursue an exit strategy and save the company from collapse."[61] And while "PDI had concerns about the payment of its own claim," those concerns did not drive PDI's actions in the proceeding, because "the overall concern of both PDI and the Court at that time was that the debtor was far behind where it needed to be to line up a buyer and preserve the value of the business for the benefit of the estate."[62] "It seemed to the Court that DeVal was asleep

7

at the wheel and entirely possible that the business was going to lose significant, if not all of its value."[63]

Judge Chan "f[ou]nd that PDI's primary design in filing the objection to exclusivity, cross-motion for a trustee, renewed motion for a trustee, and filing of its first plan, which was the only legitimate plan filed at the time, was to save DeVal from a total implosion and becoming administratively insolvent. This is not an incidental benefit to the estate. Their actions forced the debtor to wake up and try to save the company from its own inaction."[64]  After allowing counsel to submit detailed records in support of the expense claim, Judge Chan held another hearing on September 26, 2018, to scrutinize the requested expenses.

### *Judge Chan's November 15, 2018 opinion.*

In a November 15, 2018 opinion, Judge Chan "elaborate[d] on [the court's] holding that PDI made a substantial contribution to the case and qualifies for an administrative expense claim pursuant to section 503(b)(3)(D) and section 503(b)(4)."[65]  Judge Chan explained "PDI's efforts conferred an actual and demonstrable benefit to [DeVal's] creditors because PDI's Objection, Trustee Motion and initial PDI Plan pressured [DeVal] into finally taking action to consummate a sale of its assets, after months of inaction, before it ran out of cash and collapsed."[66] "[F]ar more than an incidental benefit to the estate," PDI's actions "sav[ed] the Debtor and preserv[ed] the value of the Debtor at a critical juncture in the case."[67]  Without PDI's aggressive approach, Judge Chan found, "the unsecured creditors likely would have received nothing in this case."[68]

Judge Chan highlighted the demonstrable improvement following PDI's filings. PDI's "Trustee Motion resulted in the actual benefit of the appointment of an independent professional to help [DeVal] act in accordance with its fiduciary duties in the face of allegations of malfeasance and promote the estate's best interests."[69]  Following Deval's appointment of the Chief

8

Restructuring Officer, Judge Chan found, Deval's "alleged overuse of cash collateral seemed to stop in response to the additional oversight."[70]

Judge Chan found PDI overcame "the presumption of self-interest since these actions specifically were made for the benefit of all creditors in the case, not just PDI."[71] And "[a]lthough PDI may have entered the case primarily motivated to protect its own claim in the case, the facts and circumstances surrounding these three filings demonstrate that PDI's actions transcended self-protection."[72] Judge Chan found PDI's filings were not intended to protects its own interests but "were primarily designed to accelerate the sale process in order to preserve the value of [DeVal's] business as a going concern and prevent the estate from becoming administratively insolvent."[73]

As further evidence of PDI's goal in taking a more aggressive approach in the case, Judge Chan found PDI's actions "were not entirely aligned with PDI's own interests."[74] Judge Chan found PDI could have incurred significantly less costs by proceedings "as a regular observer of the case," but, "in deciding to pursue a more aggressive course of action for the benefit of the estate," "took a huge risk in incurring significant costs."[75] Judge Chan also found PDI's push for a Chief Restructuring Officer evidenced conduct favoring the interests of the estate over PDI's own interests. Engaging such an independent actor "who would have no obligation to PDI involved a degree of risk that the [Chief Restructuring Officer] would not support PDI's plan, would pursue higher bidders, or would leverage competing plans to essentially force PDI to pay more in order to have its plan confirmed."[76] And "[m]ost significantly of all," Judge Chan found, "PDI's payment of all the CRO fees, without any expectation of repayment, corroborates PDI's genuine concern for protecting the value of the estate as a whole, clearly transcending self-promotion."[77]

Judge Chan also found "PDI was the only creditor that consistently showed up in this case and was solely responsible for demonstrating to the Court that [DeVal] had grossly exaggerated its sale efforts, which were critical to [DeVal's] reorganization."[78] PDI did not take any action "duplicative of any other professional's efforts."[79]

Judge Chan "then determine[d] the actual and necessary expenses incurred by PDI in making a substantial contribution under section 503(b)(3)(D) and the reasonable expenses and fees attributable to its counsel's services under section 503(b)(4)."[80] Judge Chan found counsel's time spent analyzing whether to proceed with an asset or stock purchase "primarily focused on the tax implications of these potential arrangements,"[81] which "solely served PDI's interest in getting paid on its claim."[82] Finding this work to further only PDI's self-interest, Judge Chan "disallow[ed] all time entries related to [tax] analysis in the amount of $4,658."[83]

Judge Chan also found PDI's out-of-pocket expenses for $691.41 in limousine travel to hearings and depositions "excessive and unnecessary."[84] Judge Chan found although "understandable that PDI representatives would want to guarantee timely arrivals to court or to depositions, PDI presented no evidence that a regular taxi could not have gotten them to their destination on time."[85] Judge Chan awarded PDI "an administrative expense claim pursuant to 11 U.S.C. § 503(b)(3)(D) in the amount of $8,224.71"[86] for "out of pocket expenses"[87] and "an administrative expense claim pursuant to 11 U.S.C. § 503(b)(4) in the amount of $75,469.01,"[88] the sum of "$71,648.25 in counsel fees, and $3,820.76 in counsel's expenses."[89]

Parts Life, Inc. filed a Notice of Appeal on November 27, 2018, and PDI filed a notice of cross-appeal on December 11, 2018.

## II.  Analysis

Parts Life argues the Bankruptcy Court erred in concluding PDI's actions entitled it to an award of administrative expenses because our Court of Appeals' decision in *Lebron v. Mechem*

*Financial, Inc.*, precludes an award of administrative expenses when "the creditor's primary purpose was to further its own self-interest," no matter how large a benefit such self-motivated conduct ultimately secures for the debtor's estate.[90] Parts Life argues the Bankruptcy Court improperly disregarded PDI's "admitted motivations," to acquire DeVal or repayment of its claim, and instead "appl[ied] the legal standard adopted by the Fifth and Eleventh Circuit Courts of Appeal,"[91] which "look[s] to the benefit conferred on the estate without regard to the applicant's motivations."[92] PDI counters the Bankruptcy Court properly applied our Court of Appeals' decision in *Lebron* because PDI undertook "the activities in question" to benefit the estate.[93]

Although we review the Bankruptcy Court's interpretation of legal questions de novo, "we review the Bankruptcy Court's factual findings only for clear error,"[94] meaning we may reject the Bankruptcy Court's fact findings only if "that determination is either (1) completely devoid of minimum evidentiary support displaying some hue of credibility or (2) bears no rational relationship to the supportive evidentiary data."[95] Our Court of Appeals in *Lebron* described "[t]he inquiry concerning the existence of a substantial contribution [a]s one of fact, and it is the bankruptcy court that is in the best position to perform the necessary fact finding task."[96] Applying this standard, the Bankruptcy Court did not clearly err in finding, as a matter of fact, PDI substantially contributed to the debtor's estate in a way that transcended its own interest in self-protection.

## A. Our Court of Appeals' *Lebron* holding permits recovery of administrative expenses only for creditor conduct transcending self-protection.

This dispute involves section 503(b)(3)(D) of the Bankruptcy Code, which permits a creditor to submit administrative expenses and receive as an award "the actual, necessary expenses . . . incurred by . . . [the] creditor . . . in making a substantial contribution in a case under chapter 9 or 11 of this title."[97] A creditor who receives an award of administrative expenses under section

11

503(b)(3)(D) may also receive under section 503(b)(4) "reasonable compensation for professional services rendered by an attorney or an accountant . . . based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant."[98]

The parties agree we, like the Bankruptcy Court, must apply *Lebron v. Mechem Financial, Inc.*,[99] in which our Court of Appeals interpreted section 503(b)(3)(D)'s "substantial contribution" language. *Lebron* stemmed from a dispute over control of Mechem Financial, Inc. After Mechem's board ousted minority shareholder W. James Scott from his positions as an officer and director, shareholder Scott initiated litigation against the company. Shareholder Scott discovered the company's President "misappropriated millions of dollars," and Scott then filed a complaint in equity in Pennsylvania state court seeking, among other things, "appointment of a custodian to prevent further mismanagement and fraud" and "a complete and accurate accounting of" company assets.[100] The state court ordered "inventories of all assets, investments, and accounts held by Mechem or [its President] personally," but did not receive a satisfactory inventory in response. After shareholder Scott obtained another state court order requiring the information, the company filed a chapter 11 petition.[101]

Shareholder Scott successfully moved in the Bankruptcy Court for appointment of a trustee.[102] He then provided "the trustee all of the information that he had gathered during his pre-bankruptcy petition legal actions."[103] Upon the recommendation of the trustee, the Bankruptcy Court converted the case to a chapter 7 liquidation. "The trustee also brought numerous adversary proceedings against [the President] and his wife, which resulted in the turnover of additional property to the estate" and a substantial judgment against the President and his wife.[104] Shareholder Scott then sought "reimbursement for the expenses he had incurred in connection with

the Mechem legal actions and his participation in the chapter 11 and chapter 7 proceedings" under sections 503(b)(3) and (b)(4) of the Bankruptcy Code.[105] Awarding shareholder Scott the requested reimbursements in full, the Bankruptcy Court found without shareholder Scott's "substantial contribution," the company "might still be fleecing individuals" and "could have continued to operate until all of the assets were dissipated."[106] The district court reversed, finding, as relevant here, "Scott could not recover any expenses that he incurred prior to the date Mechem filed its chapter 11 petition," and shareholder Scott could not recover administrative expenses because he undertook his actions to protect his interests.[107]

Reversing and remanding for further proceedings, our Court of Appeals addressed the meaning and history of section 503(b)(3)(D). It found this statute "represents an accommodation between the twin objectives of encouraging meaningful creditor participation in the reorganization process, and keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors."[108] Our Court of Appeals held "[i]nherent in the term 'substantial' is the concept that the benefit received by the estate *must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests.*"[109] The statute's focus on *substantial* contributions, our Court of Appeals held, requires courts apply a presumption of self-interest, which the creditor may overcome only by "satisfy[ing] the court that [its] efforts have transcended self-protection."[110] Our Court of Appeals also found Congress did not intend section 503(b)(3)(D) "to impose an across-the-board bar to the reimbursement of expenses incurred before the filing of the petition."[111]

Our Court of Appeals remanded for the Bankruptcy Court to determine whether shareholder Scott's "actions were designed to benefit others who would foreseeably be interested in the estate."[112] Our Court of Appeals acknowledged the evidence below "tending to show that

13

Scott incurred the reimbursed expense in pursuit of his own interests . . . for example, in litigation over control of Mechem initiated many months before a reorganization was anticipated by anyone."[113] But "[o]n the other hand," the court described, "there was evidence from which the bankruptcy court could have concluded that at least some of Scott's efforts were designed to benefit the chapter 11 estate and its creditors."[114] Our Court of Appeals remanded for the Bankruptcy Court to make this finding of fact.[115]

### B. The Bankruptcy Court applied the proper standard and we find no clear error in its finding of a substantial contribution.

Addressing how a creditor could overcome the presumption of self-interest, our Court of Appeals in *Lebron* explained "[a] creditor should be presumed to be acting in his or her own interest unless the court is able to find that his or her actions were designed to benefit others who would foreseeably be interested in the estate."[116] This focus on the design of the creditor's actions, Parts Life emphasizes, requires we assess not only the objective benefits flowing to the debtor's estate, but the actor's motivations in providing such benefits. Even "[a] large benefit is nonetheless incidental"—and thus cannot form the basis of an administrative expense award—"if the creditor's primary purpose was to further its own self-interest," Parts Life argues.[117]

Parts Life cites opinions from the United States Courts of Appeals for the Fifth and Eleventh Circuits critiquing *Lebron* and applying a more objective standard under section 503(b)(3)(D). "[N]othing in the Bankruptcy Code requires a self-deprecating, altruistic intent as a prerequisite to recovery of fees and expenses under section 503," the United States Court of Appeals for the Fifth Circuit found in *In re DP Partners Ltd. Partnership*.[118] The Court of Appeals for the Fifth Circuit held "[t]he benefits, if any, conferred upon an estate are not diminished by selfish or shrewd motivations," and "a creditor's motive in taking actions that benefit the estate

14

has little relevance in the determination whether the creditor has incurred actual and necessary expenses in making a substantial contribution to a case."[119]

The United States Court of Appeals for the Eleventh Circuit adopted the Fifth Circuit's objective focus on benefits flowing to the estate, reasoning "[e]xamining a creditor's intent unnecessarily complicates the analysis of whether a contribution of considerable value or worth has been made."[120] Our Court of Appeals acknowledged the disagreement in a footnote in 2012.[121] But Parts Life's emphasis on extra-circuit authority is of no moment here. Judge Chan applied *Lebron*, not authority from the United States Court of Appeals for the Fifth or Eleventh Circuits. Judge Chan's November 15, 2018 opinion discusses *Lebron* at length, emphasizing PDI "must show that its actions were designed to benefit others who would foreseeably be interested in the estate," and the court "may not allow as an administrative expense costs associated with actions primarily designed to advance the applicant's own interests."[122] And we find no error in Judge Chan's application of *Lebron* to the facts. Judge Chan found three of PDI's actions procured a substantial benefit to the estate—and PDI intended them to do so.

Parts Life's latches onto Mr. Haber's testimony PDI's broad goal in the bankruptcy case was to secure repayment of PDI's claim. But Judge Chan did not find every action PDI took in the case entitled it to an award of expenses. Judge Chan isolated discrete actions: the objection to extension of the exclusivity period, "the initial PDI Plan and the Trustee Motion.[123] Parts Life, however, would have us conflate a creditor's purpose in in the *entire case* with the creditor's purpose in taking *the acts for which it seeks an award of administrative expenses*. We find no such rule in *Lebron*. Our Court of Appeals in *Lebron* expressly acknowledged the economic reality that "[m]ost activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude

15

reimbursement."[124] Such a principle makes ample sense, as every actor in a bankruptcy case must, in a general sense, be mindful of its own interests, especially officers of corporate creditors owing a fiduciary duty and a duty of loyalty to its stakeholders and shareholders.

Parts Life also places great weight on *In re Geriatrics Nursing Home, Inc.*,[125] in which the United States Bankruptcy Court for the District of New Jersey declined to award administrative expenses to a creditor seeking to acquire the Chapter 11 debtor. In *Geriatrics Nursing*, the creditor seeking administrative expenses, Health Resources, purchased a $260.10 unsecured claim and filed a competing plan of reorganization.[126] The Bankruptcy Court found Health Resources produced a demonstrable benefit to the debtor's estate because its competing plan helped result in "the dramatic improvement in the treatment of creditors under the Debtors' confirmed plan."[127] But the court declined to award expenses after carefully reviewing time records attached to the request for administrative expenses.[128] The Bankruptcy Court found it "readily evident to the court both from the time records and the positions it took at various court hearings that Health Resource's efforts were not directed at furthering the reorganization or even at protecting its interests as a creditor, but rather were directed at acquisition of the nursing home in furtherance of its own business purposes."[129]

*Geriatrics Nursing* supports, rather than undermines, Judge Chan's findings. Judge Chan undertook the diligent time record review appropriate when a creditor has previously expressed interest in acquiring the debtor. Judge Chan carefully parsed which creditor conduct furthered its own interests in an acquisition and which creditor conduct benefitted the entire estate, awarding reimbursement only for the discrete acts motivated to benefit the debtor's estate. Judge Chan's fact findings are not undermined by *Geriatrics Nursing*, because PDI alone acted to save DeVal from imminent collapse, and in *Geriatrics Nursing*, by contrast, various creditors took an active

16

role in the case.[130]  PDI did not purchase a claim to wage a takeover of the debtor.  It had a vested interest in DeVal for years.  The parties mutually negotiated their original Asset Purchase Agreement six years before DeVal ever filed its Chapter 11 petition.

*Lebron* instructs a more relevant indication of self-interest is whether an action "would have been undertaken absent an expectation of reimbursement from the estate."[131]  The Bankruptcy Court found PDI would not have taken such an aggressive role in the bankruptcy case if it were merely looking out for its own interests.  Mr. Haber testified without the prospect of recovery of expenses, "it would [have] be[en] unlikely that we would have proceeded down this path to invest the kind of money and time that we did."[132]  Judge Chan found his testimony credible.  And Judge Chan found "PDI's primary design in filing the objection to exclusivity, cross-motion for a trustee, renewed motion for a trustee, and filing of its first plan, which was the only legitimate plan filed at the time, was to save Deval from a total implosion and becoming administratively insolvent.  This is not an incidental benefit to the estate.  Their actions forced the debtor to wake up and try to save the company from its own inaction."[133]

Ample evidence supports Judge Chan's detailed findings.  Judge Chan observed DeVal's inaction, followed by its change of course after PDI asserted itself in the proceedings.  Mr. Haber's testimony credibly presented Deval's position as "perilous."[134]   Upon managing this multi-year reorganization to success, and evaluating witness credibility, Judge Chan reasonably found PDI acted with the motivation of "accelerat[ing] the sale process in order to preserve the value of [DeVal's] business as a going concern and prevent the estate from becoming administratively insolvent."[135]   Judge Chan reviewed expense records and did not award expenses for items (such as limousines) unrelated to the debtor's benefit.  She properly followed *Lebron*.  We have no basis to challenge these detailed fact findings.

## III. Conclusion

In the accompanying order, we affirm the Bankruptcy Court's November 15, 2018 Order.

---

[1] The Bankruptcy Record is filed on our docket at ECF Doc. No. 4. We cite the Record by Bates Number, for example, "R. ___". We also take judicial notice of the Bankruptcy Court's Docket No. 16-17922, the case number on the Bankruptcy Court docket. We cite filings on the Bankruptcy Court's docket as "Bankr. Doc. No. ___".

[2] R. 250.

[3] Bankr. Doc. No. 248 at 50 (N.T. I. Haber, Aug. 1, 2018).

[4] Bankr. Doc. No. 242 at ¶ 3. "[C]losing was scheduled for December 15, 2010." *Id.*

[5] *Id.*

[6] Bankr. Doc. No. 242 at ¶ 4.

[7] *Id.* at ¶ 6.

[8] *Id.*

[9] *Id.* at ¶ 8.

[10] *Id.* at ¶ 9.

[11] R. 251.

[12] Bankr. Doc. No. 242 at ¶ 10.

[13] *Id.* at ¶ 14.

[14] *Id.*

[15] Bankr. Doc. No. 1.

[16] Bankr. Doc. No. 242 at ¶ 15.

[17] Bankr. Doc. No. 248 at 31–32 (N.T. I. Haber, Aug. 1, 2018).

[18] R. 252.

[19] Bankr. Doc. No. 69 at 1.

[20] *Id.* at 2.

[21] *Id.*

[22] *Id.*

[23] Bankr. Doc. No. 77.

[24] *Id.* at 1.

[25] *Id.* at 2.

[26] *Id.* at 3.

[27] *Id.*

[28] *Id.*

[29] Bankr. Doc. No. 92.

[30] Bankr. Doc. No. 112.

[31] R. 255.

[32] R. 256.

[33] Bankr. Doc. No. 226 at ¶ 22.

[34] R. 256.

[35] Bankr. Doc. No. 226 at ¶ 23.

[36] Bankr. Doc. No. 125 at 1 ("This is a debtor in possession in need of a Chief Restructuring Officer. If the Debtor refuses to introduce one, a Chapter 11 trustee should be appointed either for cause or because it would be in the best interests of the Debtor's estate.").

[37] *Id.* at 4.

[38] *Id.* at 5.

[39] Bankr. Doc. No. 133 at 1.

[40] Bankr. Doc. No. 135.

[41] Bankr. Doc. No. 157 at 1.

[42] Bankr. Doc. No. 165.

[43] R. 257.

[44] *Id.*

[45] Bankr. Doc. No. 226.

[46] *Id.* at ¶ 11.

[47] *Id.* at ¶ 4.

[48] *Id.* at ¶ 13.

[49] Bankr. Doc. No. 248.

[50] *Id.* at 2.

[51] *Id.* at 30.

[52] *Id.* at 32.

[53] *Id.* at 33.

[54] *Id.*

[55] *Id.* at 34.

[56] *Id.* at 34–35.

[57] *Id.* at 35.

[58] *Id.* at 93.

[59] *Id.* at 94.

[60] *Id.* at 95.

[61] *Id.* at 96.

[62] *Id.* at 95.

[63] *Id.*

[64] *Id.* at 96.

[65] R. 262.

[66] R. 266.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] R. 267.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] R. 268.

[79] R. 267.

[80] R. 263.

[81] R. 270.

[82] R. 271.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] Bankr. Doc. No. 255.

[87] R. 272.

[88] Bankr. Doc. No. 255.

[89] R. 272.

[90] ECF Doc. No. 7 at 31 (emphasis omitted).

[91] *Id.* at 14.

[92] *Id.* at 13.

[93] ECF Doc. No. 9 at 10 (emphasis omitted).

[94] *In re Tropicana Entm't LLC*, 498 F. App'x 150, 152 (3d Cir. 2012).

[95] *In re Diloreto*, 442 B.R. 373, 375 (E.D. Pa. 2010) (quoting *In re Piccoli*, 2007 WL 2822001, *3 (E.D. Pa. Sept. 27, 2007)).

[96] *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 946 (3d Cir. 1994).

[97] 11 U.S.C. § 503(b)(3)(D).

[98] 11 U.S.C. § 503(b)(4).

[99] 27 F.3d 937, 944 (3d Cir. 1994).

[100] *Id.*

[101] *Id.* at 940–41.

[102] *Id.* at 941.

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.* (citation and internal quotation marks omitted).

[107] *Id.* at 942.

[108] *Id.* at 944 (citations and internal quotation marks omitted).

[109] *Id.* (emphasis added).

[110] *Id.*

[111] *Id.* at 945.

[112] *Id.* at 946.

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] ECF Doc. No. 7 at 31 (emphasis omitted).

[118] 106 F.3d 667, 673 (5th Cir. 1997).

[119] *Id.*

[120] *In re Celotex Corp.*, 227 F.3d 1336, 1338 (11th Cir. 2000).

[121] *See Tropicana*, 498 F. App'x at 152 n.3 ("We note that two of our sister Courts of Appeals disagree with our substantial contribution analysis set forth in *Lebron.*").

[122] R. 264.

[123] R. 267.

[124] *Lebron*, 27 F.3d at 944.

[125] 195 B.R. 34 (Bankr. D.N.J. 1996).

[126] *Id.* at 36.

[127] *Id.* at 37.

[128] *Id.* at 38–39.

[129] *Id.* at 39.

[130] *Id.* at 36 ("Competing plans of reorganization and disclosure statements were also filed by Van Dyk Health Care, Inc. ('Van Dyk') and First Fidelity.").

[131] *Lebron*, 27 F.3d at 944.

[132] Bankr. Doc. No. 248 at 35.

[133] *Id.* at 96.

[134] Bankr. Doc. No. 248 at 32–33.

[135] R. 267.